UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DEUTSCHE BANK TRUST COMPANY )
AMERICAS, as Trustee and Securities )
Intermediary, )
)
                      Plaintiff, )
)   Case No.: 1:08 CV 955 (LAK)
            - against - )
)   **Electronically Filed**
LACROSSE FINANCIAL PRODUCTS, LLC, )
CEDE & CO., as Holder of certain Secured )
Notes and nominee name of the Depository )
Trust Company, AURELIUS CAPITAL )
PARTNERS, LP, AURELIUS CAPITAL )
MASTER, LTD., BANK OF AMERICA, )
N.A., THE BANK OF N.T. BUTTERFIELD & )
SON LIMITED, CLASS V FUNDING II )
LTD., CLIFTON I CDO LIMITED, )
DRESDNER KLEINWORT (a.k.a. )
DRESDNER KLEINWORT LIMITED), IXIS )
ABS CDO 3 LTD., MAGNETAR )
CONSTELLATION MASTER FUND, LTD., )
MAGNETAR CONSTELLATION MASTER )
FUND III, LTD., MAGNETAR )
CONSTELLATION FUND II, LTD., )
PALMER SQUARE 3 LIMITED, )
REVELSTOKE CDO I LTD., ROYAL BANK )
OF CANADA, SILVER ELMS CDO plc, UBS )
ABSOLUTE RETURN BOND FUND, a fund )
of UBS Funds, Inc., UBS GLOBAL BOND )
FUND, a fund of UBS Funds, Inc., and DOES )
1 through 100, owners of beneficial interests in )
the Secured Notes, )
)
                    Defendants. )

---

**MEMORANDUM OF LAW IN SUPPORT OF THE MOTION
FOR SUMMARY JUDGMENT AND DEFAULT JUDGMENT BY
<u>INTERPLEADER DEFENDANT LACROSSE FINANCIAL PRODUCTS, LLC</u>**

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................. 1

BACKGROUND & RELEVANT FACTS............................................................................... 3

    I.       Structure Of The Transaction...................................................................................... 3

    II.      The Super Senior Facility Agreement......................................................................... 4

    III.    Acceleration Of The Issuer's Payment Obligations And Dispute Regarding The Distribution Of The Interpleader Funds...................................................................... 5

    IV.    The Interpleader Action And Withdrawal Of The Appearing Holders' Claims................ 6

    V.     The Current Status Of The Transaction ..................................................................... 8

ARGUMENT............................................................................................................................. 9

CONCLUSION........................................................................................................................ 13

# TABLE OF AUTHORITIES

## CASES

Page(s)

*American Stock Transfer & Trust Co. v. Par Pharmaceutical
   Companies, Inc.*,
   No. 06-CV-13283, 2009 WL 1754473 (S.D.N.Y. June 22, 2009) ..............................10

*Amoco Transport Co. v. Dietze, Inc.*,
   582 F. Supp. 804 (S.D.N.Y. 1984)........................................................................9, 10

*Central States Southeast and Southwest Areas Health & Welfare
   Fund v. Lawhon*,
   No. 07-CV-335, 2008 WL 62174 (N.D. Fla. Jan. 3, 2008) ..........................................9

*Lincoln General Insurance Co. v. State Farm Mutual Automobile
   Insurance Co.*,
   425 F. Supp. 2d 738 (E.D. Va. 2006) ...........................................................................9

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*,
   475 U.S. 547 (1986).....................................................................................................9

*New York Life Insurance Co. v. Connecticut Development Authority*,
   700 F.2d 91 (2d Cir. 1983)...........................................................................................9

*National Union Fire Insurance Co. v. Stroh Companies*,
   265 F.3d 97 (2d Cir. 2001)...........................................................................................9

*Sun Life Assurance Co. of Canada (U.S.) v. Conroy*,
   431 F. Supp. 2d 220 (D.R.I. 2006).........................................................................9, 10

## STATUTES

Fed. R. Civ. P. 56(c) ..............................................................................................................1, 9

28 U.S.C.§ 1655…………........................................................................................................7

Interpleader defendant LaCrosse Financial Products, LLC ("LaCrosse") respectfully submits this memorandum of law in support of its motion (the "Motion") for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure (the "Federal Rules"), and for default judgment against certain interpleader defendants pursuant to Rule 55 of the Federal Rules. LaCrosse is the only remaining claimant to the funds at issue in this interpleader action and, in any event, is entitled to the funds under the documents governing the transaction in question. Accordingly, the Court should grant summary judgment in favor of LaCrosse and direct that the interpleader funds be distributed in accordance with its claim.

## PRELIMINARY STATEMENT

This interpleader action arises from the collateralized debt obligation ("CDO") transaction closed by Sagittarius CDO I Ltd. (the "Issuer") in March 2007 (the "Transaction"). Interpleader plaintiff Deutsche Bank Trust Company Americas ("Deutsche Bank") is the trustee under the indenture (the "Indenture") governing the Transaction,[1] and LaCrosse is the counterparty (referred to as the "Super Senior Counterparty") to a swap agreement with the Issuer (referred to as the "Super Senior Facility Agreement"). As described more fully below, under the Super Senior Facility Agreement, LaCrosse is entitled to periodic payments and other consideration in exchange for providing the Issuer with up to $630 million in credit protection for the Transaction.

During the life of the Transaction, one of Deutsche Bank's duties was to distribute the cash flows generated by the Issuer's assets on a monthly basis in accordance with the Indenture. In January 2008, Deutsche Bank commenced this action because it believed a dispute

---

[1] By Order of this Court entered on July 28, 2009, Deutsche Bank deposited the funds at issue with the registry of the Court and was dismissed from the action.

existed among certain Transaction participants regarding how those cash flows should be distributed following the Event of Default[2] and acceleration of the Issuer's payment obligations that occurred in November 2007. Deutsche Bank began to escrow the disputed cash flows after the Event of Default and acceleration.

Approximately one year after the commencement of this action, the Transaction was terminated in accordance with the relevant provisions of the documents. None of the Transaction participants contested the termination. Deutsche Bank liquidated the Issuer's asset portfolio (which, of course, meant there would be no additional cash flows from those assets) and paid out the monies received on account of the liquidation in accordance with the Indenture. Thus, the funds at issue in this action consist of approximately $34 million in cash flows generated by the Issuer's asset portfolio that Deutsche Bank collected and set aside between November 2007 and the liquidation (such cash flows, together with interest thereon, the "Interpleader Funds"). LaCrosse, as the Super Senior Counterparty, and certain owners of beneficial interests in the Issuer's securities (collectively, the "Appearing Holders")[3] are the only parties that appeared in this action and asserted claims to the Interpleader Funds.[4]

There is no longer any dispute regarding how the Interpleader Funds must be distributed because each of the Appearing Holders withdrew its respective claim to those funds

---

[2]   Each capitalized term used but not defined herein has the meaning given to such term in the Indenture.

[3]   The Appearing Holders are: Aurelius Capital Master, Ltd.; Aurelius Capital Partners, LP; Bank of America, N.A.; The Bank of N.T. Butterfield & Son Limited; Commerzbank AG London Branch (trading as Dresdner Kleinwort); Magnetar Constellation Master Fund, Ltd; Magnetar Constellation Fund II, Ltd; Magnetar Constellation Master Fund III, Ltd; Revelstoke CDO I Limited; UBS Absolute Return Bond Fund and UBS Global Bond Fund.

[4]   Interpleader defendant Cede & Co. ("Cede"), a securities depository that holds legal title to certain securities issued in the Transaction for the benefit of certain depository participants, also appeared in this action but did not file a claim to the funds at issue.

and was dismissed from this action. As a result, no party contests LaCrosse's position regarding how the Indenture requires the Interpleader Funds be distributed. Thus, the Court should grant summary judgment in favor of LaCrosse and direct that the Interpleader Funds be distributed in accordance with its claim.

# BACKGROUND & RELEVANT FACTS[5]

## I. Structure Of The Transaction

Although the features of CDO transactions vary, in simplest terms, a CDO is a transaction wherein a special purpose vehicle (generally referred to as the "issuer") (i) issues unfunded obligations, funded notes and/or equity securities to investors and (ii) uses the proceeds of the issuance to acquire a portfolio of bonds, loans and/or credit default swaps. During the life of the transaction, returns on an issuer's asset portfolio are periodically distributed to satisfy the issuer's payment obligations, including those to the investors that bought the issuer's notes or equity securities. *See*, *e.g.*, LaCrosse Aff. Cl. ¶ 4; *see also* Indenture §§ 1.1, 5.5, 10.2, 11.1.

The Transaction is a CDO that closed on March 15, 2007. Indenture § 1.1 (definition of "Closing Date"). At that time, the Issuer: (i) entered into the Super Senior Facility Agreement (described more fully below) with LaCrosse; (ii) issued several classes of notes (the

---

[5] For the Court's convenience, the following documents are attached as Exhibits 1-6 to the Declaration of Scott E. Eckas, dated October 2, 2009 (the "Eckas Declaration"), submitted herewith: (1) the Amended Interpleader Complaint (the "Amended Complaint" or "Am. Compl.," Docket No. 70); (2) the Answer of Cede & Co. to Amended Complaint ("Cede Ans.," Docket No. 78); (3) the First Amended Answer and Affirmative Defenses of LaCrosse and Affirmative Claim to the Interpleader Funds ("LaCrosse's Aff. Cl.," Docket No. 77); (4) the memorandum of law in support of LaCrosse's motion for judgment on the pleadings (Docket No. 93); (5) the Clerk's Certificate noting the default of interpleader defendant Palmer Square 3 Limited ("Palmer") and (6) the Clerk's Certificate noting the default of interpleader defendant Silver Elms CDO plc ("Silver Elms"). In addition, pursuant to the Court's Order entered March 21, 2008 (Docket No. 20), Deutsche Bank filed the Indenture under seal, and pursuant to the Court's Order entered April 8, 2009 (Docket No. 103), LaCrosse filed the Offering Circular, dated March 12, 2007 ("OC"), the Super Senior Facility Agreement, dated March 15, 2007 and the Notice of Distribution of Liquidation Proceeds, dated February 10, 2009, as amended as of August 7, 2009 ("Liquidation Proceeds Notice"), under seal.

"Notes") and a class of equity interests (together with the Notes, the "Securities");[6] (iii) used the proceeds of that issuance to acquire an asset portfolio predominantly consisting of mortgage-backed securities that depend on the cash flows from pools of residential mortgage loans and credit default swaps referencing the same type of mortgage-backed securities and (iv) entered into various related agreements. *See generally* Indenture; OC; LaCrosse Aff. Cl. ¶¶ 4-5. Pursuant to the Indenture, one of Deutsche Bank's duties as trustee was to collect the cash flows generated by the Issuer's asset portfolio (*e.g.*, interest and principal payments on the mortgage-backed securities, fixed payments on the credit default swaps, etc.) and to periodically distribute them to satisfy the Issuer's payment obligations, including those owed to LaCrosse and the Appearing Holders. Indenture §§ 11.1, 13.1; LaCrosse Aff. Cl. ¶¶ 4-5, 15.

## II.     The Super Senior Facility Agreement

Although structured as a swap, the Super Senior Facility Agreement was akin to a credit facility under which the Issuer had the right to borrow from LaCrosse if specified requirements were met (this arrangement is hereafter referred to as the "Super Senior Facility"). Pursuant to the Super Senior Facility Agreement, LaCrosse was not required to make any cash payment at the time the Transaction closed. Indenture § 10.18; Super Senior Facility Agreement, Confirmation at 1-4; OC at 18, 71-72; LaCrosse Aff. Cl. ¶¶ 9-11. Rather, LaCrosse was required to make a payment of up to $630 million to the Issuer under the Super Senior Facility Agreement at the termination of the Transaction if certain conditions were satisfied. Indenture § 10.18;

---

[6]     The Issuer issued the following tranches of Securities: (i) $15 million Class S Notes, (ii) $133 million Class A Notes, (iii) $82.5 million Class B Notes, (iv) $45 million Class C Notes, (v) $14.5 million Class D-1 Notes, (vi) $27.5 million Class D-2 Notes, (vi) $12.5 million Class D-3 Notes, (vii) $10 million Class E Notes, (viii) $15 million Class X Notes and (ix) $45 million in Subordinated Notes. *See generally* Indenture; OC.

4

Super Senior Facility Agreement, Confirmation at 1-4; OC at 18, 71-72; LaCrosse Aff. Cl. ¶¶ 9-12.

In exchange for LaCrosse's $630 million funding commitment, the Issuer owed two types of payment obligations to LaCrosse.  First, to the extent the Super Senior Facility was unfunded, the Issuer was required to pay LaCrosse a periodic commitment fee and make deposits into a segregated account held by the Issuer (referred to as the "Permanent Reduction Reserve Account") until LaCrosse's remaining funding commitment was reduced to zero.  Indenture §§ 1.1, 10.6(a), 11.1; Super Senior Facility Agreement, Confirmation at 4; LaCrosse Aff. Cl. ¶ 8. Deposits into the Permanent Reduction Reserve Account result in a dollar-for-dollar reduction of LaCrosse's funding commitment under the Super Senior Facility Agreement.  Indenture. §§ 1.1 (definitions of "Permanent Reduction Reserve Amount" and "Super Senior Notional Amount"), 10.6; Super Senior Facility Agreement, Confirmation at 2 (definition of "Super Senior Notional Amount"); OC at 72.  Second, to the extent LaCrosse funded the Super Senior Facility, the Issuer was required to repay the amount advanced by LaCrosse together with interest thereon. Indenture §§ 1.1, 11.1.  As discussed below, the Issuer's payment obligations to LaCrosse, as Super Senior Counterparty, are senior to its obligations on the Securities.  Indenture §§ 11.1, 13.1.

**III.    Acceleration Of The Issuer's Payment Obligations And
         Dispute Regarding The Distribution Of The Interpleader Funds**

On November 6, 2007, Deutsche Bank notified the relevant parties that an Event of Default had occurred under Section 5.1(j) of the Indenture due to the deterioration of the Issuer's asset portfolio.  LaCrosse Aff. Cl. ¶¶ 21-22.  On the same date, LaCrosse, exercising its rights as the Controlling Class under the Indenture, directed Deutsche Bank to accelerate the Notes by declaring the outstanding principal thereon to be immediately due and payable.

5

LaCrosse Aff. Cl. ¶ 23; Am. Compl. ¶¶ 54-55.  Deutsche Bank complied with that direction and all amounts payable under the Indenture, including all the Issuer's payment obligations to LaCrosse, became immediately due and payable.  *See* Indenture §§ 5.2, 11.1, 13.1; Am. Compl. ¶ 55.

Relying on Section 13.1(a) of the Indenture, LaCrosse also instructed Deutsche Bank to deposit future cash flows generated by the Issuer's assets into the Permanent Reduction Reserve Account until LaCrosse's funding commitment under the Super Senior Facility Agreement was reduced to zero before making any further payment or distribution on account of the Securities (including those held by the Appearing Holders).  LaCrosse Aff. Cl. ¶ 24.  Certain of the Appearing Holders subsequently informed Deutsche Bank that they disagreed with LaCrosse's position regarding the application of the Issuer's funds following an Event of Default and acceleration.  *See id*. ¶ 25; *see also* Am. Compl. ¶¶ 63-65.

## IV.  The Interpleader Action And Withdrawal Of The Appearing Holders' Claims

In light of this dispute, Deutsche Bank commenced this interpleader action by filing a complaint on January 29, 2008.  *See generally* Interpleader Compl. (Docket No. 1).  On November 5, 2008, Deutsche Bank filed an Amended Complaint naming additional parties as interpleader defendants.  Am. Compl. ¶¶ 40-51.

On July 28, 2009, the Court entered an Order (the "Interpleader Order," Docket No. 142) holding that this action is appropriately brought as an interpleader over which the Court has jurisdiction and enjoining any separate litigation relating to the Interpleader Funds or the Transaction.  In addition, the Interpleader Order required Deutsche Bank to deposit the

Interpleader Funds with the registry of the Court and dismissed Deutsche Bank from the action.[7] *Id.* Finally, the Interpleader Order provided for service by publication on absent or unidentified owners of beneficial interests in the Securities under 28 U.S.C. § 1655 and set September 25, 2009 as the deadline to intervene, appear, join or plead in this action.[8] *Id.*

LaCrosse, Cede and the Appearing Holders are the only parties that appeared in this action by the September 25, 2009 deadline, and only LaCrosse and the Appearing Holders filed claims to the Interpleader Funds.[9] On July 28, 2009, August 5, 2009 and September 10, 2009, the Court entered stipulations (Docket Nos. 138-43, 146) pursuant to which each of the Appearing Holders withdrew its claim to the Interpleader Funds and was dismissed from this action.[10] Eckas Decl. ¶ 2. Accordingly, no party contests LaCrosse's position that: (i) on each

---

[7]   In accordance with the Interpleader Order, Deutsche Bank deposited the Interpleader Funds, totaling $34,649,642.17, with the registry of the Court on August 14, 2009. *See* Docket Entry, dated August 17, 2009. Because the Court has put the Interpleader Funds in an interest bearing account, the actual amount of funds in the Court's registry for this case is somewhat greater and will continue to increase over time until paid out.

[8]   Although not relevant to this Motion, it is difficult to imagine that any owner of a beneficial interest in the Securities could possibly be unaware of this dispute. Quite apart from the ample notice provided for in the Interpleader Order, Deutsche Bank began setting aside the Interpleader Funds in November 2007. *See* Am. Compl. ¶ 66. Thus, beneficial holders have not received any payments on their Securities since that time. *Id.*

[9]   Although Cede appeared in this action, it did not file a claim to the Interpleader Funds and specifically averred it does not intend to take an active role in this litigation. *See generally* Cede Answer. As detailed in its Answer, Cede is the nominee name of the Depository Trust Company ("DTC"), a securities depository and clearing agency. Cede Answer ¶ 2. Cede has no beneficial ownership in securities registered in its name. *Id.* ¶¶ 2, 6. Rather, Cede holds legal title to such securities for the benefit of the DTC participants (*i.e.*, financial institutions) to whose accounts such securities are credited. *Id.* ¶ 2. Cede asked to be dismissed from this action and specifically averred it had notified relevant DTC participants of this action and defers to their "legal and factual positions." *See generally id.*

[10]   Prior to the dismissal of the Appearing Holders, LaCrosse had filed a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules, which the Appearing Holders opposed. *See* Motion by Lacrosse for Judgment on the Pleadings (the "LaCrosse 12(c) Motion," Docket No. 92); *see*, *e.g.*, The Bank of N.T. Butterfield & Son Limited's Memorandum of Law in Opposition to the 12(c) Motion (Docket No. 105). By Order entered on June 17, 2009 (Docket No. 137), the LaCrosse 12(c) Motion was withdrawn.

monthly payment date prior to the liquidation, the Interpleader Funds should have been deposited into the Permanent Reduction Reserve Account to reduce LaCrosse's funding commitment under the Super Senior Facility Agreement, and (ii) upon the Transaction's termination, the Interpleader Funds in that account should have been distributed in accordance with the liquidation provisions of the Indenture.

## V.     The Current Status Of The Transaction

On February 10, 2009 (the "Liquidation Date"), the Transaction was terminated, and Deutsche Bank liquidated the Issuer's asset portfolio and paid out the monies received on account of the liquidation in accordance with Section 11.1(a)(iii) of the Indenture (the "Final Maturity Waterfall").[11]  *See, e.g.*, Liquidation Proceeds Notice, ¶¶ 1-2.  Due to the condition of the Issuer's asset portfolio, the credit markets in general and Deutsche Bank's retention of the Interpleader Funds in light of this action, the proceeds of the liquidation were insufficient to cover the Issuer's payment obligations to even the parties senior to LaCrosse (the "Senior Obligations").[12]  *Id.* at App. 3.  In addition, LaCrosse's payment obligations under the Super Senior Facility Agreement became due and owing on the Liquidation Date, and hundreds of millions of dollars were paid to the Issuer in satisfaction of those obligations.  *Id.*  If -- consistent with LaCrosse's position -- the Interpleader Funds had been deposited into the Permanent Reduction Reserve Account and paid out on the Liquidation Date in accordance with the Final Maturity Waterfall, LaCrosse's ultimate payment obligation under the Super Senior Facility Agreement would have been reduced and the Senior Obligations would have been paid in full.

---

[11]     No party objected to the liquidation or the distribution of the liquidation proceeds.

[12]     The Issuer owed the Senior Obligations to Wachovia Bank, National Association ("Wachovia") and The Bank of New York Company ("BNY").  Approximately, $17,400,266.73 remained owing to those parties.  *Id.*

## **ARGUMENT**

Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Nat'l Union Fire Ins. Co. v. Stroh Cos.*, 265 F.3d 97, 103 (2d Cir. 2001) (granting summary judgment "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party") (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Here, the Court should grant summary judgment for LaCrosse because there is no dispute that the Interpleader Funds should be distributed in accordance with its claim.

*First*, the law squarely holds that if there is only one remaining claim to the funds at issue in an interpleader action, the funds should be distributed in accordance with that claim. *See*, *e.g.*, *N.Y. Life Ins. Co. v. Conn. Dev. Auth.*, 700 F.2d 91, 95 (2d Cir. 1983); *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Lawhon*, No. 07-CV-335, 2008 WL 62174, at *1 (N.D. Fla. Jan. 3, 2008); *Sun Life Assurance Co. of Canada (U.S.) v. Conroy*, 431 F. Supp. 2d 220, 226 (D.R.I. 2006); *Lincoln Gen. Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 425 F. Supp. 2d 738, 744 (E.D. Va. 2006); *Amoco Transp. Co. v. Dietze, Inc.*, 582 F. Supp. 804, 805 (S.D.N.Y. 1984). Here, LaCrosse is the only remaining claimant to the Interpleader Funds and the Court should grant judgment in LaCrosse's favor on that basis alone.[13] *See*, *e.g.*, *Lincoln Gen. Ins. Co.*, 425 F. Supp. 2d at 744 (granting summary judgment in favor of sole remaining claimant in interpleader

---

[13] As noted above, each Appearing Holder has withdrawn its claim to the Interpleader Funds and been dismissed. In addition, there are two remaining interpleader defendants, Palmer and Silver Elms, who were served but did not appear, plead or otherwise defend in this action. On May 15, 2009, the Clerk of the Court noted the defaults of Palmer and Silver Elms, and issued Certificates of Default stating that each of Palmer and Silver Elms was properly served and failed to answer or appear. Eckas Decl. ¶ 3. By this Motion, LaCrosse seeks entry of a default judgment against each of these entities. *See*, *e.g.*, *Sun Life Assurance Co.*, 431 F. Supp. 2d at 226 (granting default judgment on motion of interpleader defendant against non-appearing interpleader defendant).

action when other potential claimants either withdrew or failed to assert a claim); *Sun Life Assurance Co.*, 431 F. Supp. 2d at 226 (granting judgment in favor of sole remaining interpleader defendant); *Amoco Transp. Co.*, 582 F. Supp. at 805 (same).

**_Second_**, even if there were an interpleader defendant remaining who disagreed with LaCrosse's position (there is not), LaCrosse would still be entitled to the relief requested herein because the distribution of Interpleader Funds it seeks comports with the Indenture's clear terms. The law is well-settled that "when clear and unambiguous language is used, a contract should be enforced according to its own terms." *E.g.*, *Am. Stock Transfer & Trust Co. v. Par Pharm. Cos.*, No. 06-CV-13283, 2009 WL 1754473, at *2 (S.D.N.Y. June 22, 2009). The Indenture unambiguously provides that, following an Event of Default and acceleration, all the Issuer's payment obligations to LaCrosse as the Super Senior Counterparty (including, but not limited to, deposits into the Permanent Reduction Reserve Account until the LaCrosse's funding commitment under the Super Senior Facility Agreement is reduced to zero) must be satisfied before making any further payment or distribution on account of the Securities. *See* Indenture § 13.1(a).

Under the Indenture, each of the parties to whom the Issuer potentially could owe money had a different level of risk that it would not be paid if the Transaction became distressed and cash flows from the Issuer's asset portfolio were diminished. *E.g.*, Indenture §§ 2.6, 11.1, 13.1. The Transaction documents gave LaCrosse, as the Super Senior Counterparty, certain rights and contractual protections that ensure any losses caused by diminished cash flows would be borne by holders of the Securities before the Issuer's payment obligations to LaCrosse would

be impaired.[14]  *E.g.*, *id*. §§ 11.1, 13.1.  Those protections include the subordination agreement by the holders of the Securities for the benefit of LaCrosse set forth in Section 13.1(a) of the Indenture.  *Id*. § 13.1(a).

The payment distribution schedule in Section 11.1(a)(i)-(ii) of the Indenture (the "Priority of Payments") generally dictates how Deutsche Bank must distribute the proceeds of the Issuer's asset portfolio each month during the life of the Transaction.  *Id*. § 11.1(a)(i)-(ii).  However, the subordination provisions in Section 13.1 trump the Priority of Payments after an Event of Default and acceleration.  *Id*. §§ 11.1 (Priority of Payments is "subject to" § 13.1), 13.1(a) ("[a]nything in this Indenture or the Secured Notes to the contrary notwithstanding").  Among other things, Section 13.1 sets forth the agreement by the holders of the Securities that, following an Event of Default and acceleration, their right to receive payments on account of their holdings will be subordinate to LaCrosse's right to have the Issuer's payment obligations owed to it satisfied.  *Id*. § 13.1(a)-(i).  Put another way, following an Event of Default and acceleration, the Issuer's payment obligations to LaCrosse must be satisfied before payments may be made on account of the Securities.  *Id*.

Section 13.1(a) provides:

> **Anything in this Indenture or the Secured Notes to the contrary notwithstanding**, the Issuer and the Holders of the Secured Notes agree for the benefit of the Collateral Manager, the Super Senior Counterparty, the Synthetic Asset Counterparty, the TRS Facility Provider, the Liquidity Provider and any Hedge Counterparty that the Secured Notes and the Issuer's rights in and to the Collateral (with respect to all amounts payable to such party senior in priority to the Secured Notes pursuant to Section 11.1(a), the "**Subordinate Interests**") shall be subordinate and junior to the rights of such

---

[14]   As one would expect, the holders of the Securities were entitled to the possibility of a greater return (*e.g.*, a higher interest rate) than LaCrosse in exchange for assuming a greater risk of loss.  *See* Indenture § 2.2.

> party with respect to payments to be made to such party pursuant to the applicable Transaction Agreement to the extent and in the manner set forth in Section 11.1(a). **If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article 5, including as a result of an Event of Default specified in Section 5.1(g) or 5.1(h), all amounts payable to** the Collateral Manager, the **Super Senior Counterparty** [(**LaCrosse**)], the Synthetic Asset Counterparty, the TRS Facility Provider, the Liquidity Provider or any Hedge Counterparty **pursuant to Section 11.1(a) shall be paid in Cash** or, to the extent any such party consents, other than in Cash, **before any further payment or distribution is made on account of the Subordinate Interests** [(*i.e.*, **the Securities**)].

Indenture § 13.1(a) (emphasis added). The language quoted above clearly provides that, following an Event of Default and acceleration, all payment obligations owed to LaCrosse under Section 11.1(a) must be satisfied before any further payments or distributions are made to holders of "Subordinate Interests" as defined in Section 13.1(a) (*i.e.*, the Securities).[15] *See id*. Section 11.1(a) expressly provides the Issuer has the obligation to LaCrosse to make deposits into "the Permanent Reduction Reserve Account until the Super Senior Notional Amount [(*i.e.*, LaCrosse's funding commitment)] is reduced to zero." *Id.* §§ 11.1(a)(ii)(5), 11.1(a)(iii).

Thus, under the plain terms of the Indenture, the cash flows that make up the Interpleader Funds should have been deposited on a monthly basis into the Permanent Reduction Reserve Account until defeasance of LaCrosse's funding commitment. *Id.* §§ 11.1(a)(ii)(5), 11.1(a)(iii), 13.1(a). The Indenture further provides that, upon the termination of the Transaction, all funds in the Permanent Reduction Reserve Account must be distributed in accordance with the Final Maturity Waterfall. *Id.* §§ 11.1(a)(iii), 13.1(a)-(i). Accordingly, had the Interpleader Funds been properly distributed, each of the two Senior Obligations would have

---

[15] LaCrosse's interpretation of the Indenture is more fully discussed in its memorandum of law filed in support of the LaCrosse 12(c) Motion, attached as <u>Exhibit 5</u> to the Eckas Declaration.

been paid in full at the time of termination of the Transaction and the amount that LaCrosse was required to pay the Issuer at that time would have been less. Distribution of the Interpleader Funds in the manner requested by LaCrosse will place LaCrosse and the holders of the Senior Obligations in the same position they would have been in had the Interpleader Funds been properly distributed.

## CONCLUSION

For the foregoing reasons, LaCrosse respectfully requests that the Court grant this Motion and enter judgment in its favor (i) directing the Clerk of the Court to release the Interpleader Funds as follow:  (a) in satisfaction of the Senior Obligations, $11,093,348 shall be paid as directed by Wachovia and $6,709,292 shall be paid as directed by BNY, and (b) all Interpleader Funds remaining after those payments are made shall be paid as directed by LaCrosse; and (ii) entering judgment against Palmer or Silver Elms extinguishing any claim those parties may have had to the Interpleader Funds. LaCrosse also requests any such other and further relief as this Court deems just and proper.

Dated:      New York, New York
            October 2, 2009

                                        BINGHAM McCUTCHEN LLP

                                        */s/ Scott E. Eckas*
                                        Scott E. Eckas (SE 7479)
                                        *scott.eckas@bingham.com*
                                        Kevin J. Biron (KB 1030)
                                        *kevin.biron@bingham.com*
                                        399 Park Avenue
                                        New York, NY  10022
                                        Tel:  (212) 705-7000
                                        Fax: (212) 752-5378

                                        *Attorneys for Interpleader Defendant
                                        LaCrosse Financial Products, LLC*

13